UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT
BRIDGEPORT DIVISION

− − − − − − − − − − − − − − − − − − − − − − − − − − − X
:
In re: 151 MILBANK, LLC           :    Chapter 11
:
    Debtor.              :    Case No.: 15-51485
:
:
− − − − − − − − − − − − − − − − − − − − − − − − − − − X

**PRELIMINARY OBJECTION BY RICHARD M. COAN, CHAPTER 7
TRUSTEE, TO DEBTOR'S MOTION FOR AUTHORITY TO USE
CASH COLLATERAL ON A PRELIMINARY AND FINAL BASIS, AND TO
PROVIDE ADEQUATE PROTECTION, INCLUDING THE GRANTING OF LIENS,
SUPERPRIORITY ADMINISTRATIVE CLAIMS AND RELATED RELIEF**

Richard M. Coan, Trustee of the Bankruptcy Estate of Sean Dunne (the "**Trustee**"), by

and through his undersigned attorneys, hereby files this objection (the "**Objection**") to the

Motion for Authority to Use Cash Collateral on a Preliminary and Final Basis, and to Provide

Adequate Protection, Including the Granting of Liens, Superpriority Administrative Claims and

Related Relief (the "**Cash Collateral Motion**") filed by the above-captioned debtor (the

"**Debtor**") in the above-captioned case (the "**Case**").  In support of its objection, the Trustee

asserts as follows:

## PRELIMINARY STATEMENT

The issue before the Court is *not* whether to develop and sell the Units (as defined

below).  All parties are in agreement that should happen as soon as possible.  The issue before

the Court is whether to allow the Debtor – an entity controlled by Sean Dunne – to control such

development and sale, to allow the Debtor to engage in self-interested transactions, and allow the

Debtor to operate behind closed doors, without the oversight of any third party (including this Court).

Although the Cash Collateral Motion is couched as a traditional motion to approve use of cash collateral in a traditional bankruptcy case, it is anything but that. This is a motion by a Sean Dunne-controlled entity to approve the use of cash by a Sean Dunne-controlled entity to pay a Sean Dunne-controlled entity. To put it simply, this Court needs to consider with great skepticism any proposal by this Debtor, especially when it is as conflicted and self-interested as is this Motion.

It is important to note that the Trustee does not object (and never has objected) to the completion of construction of the Units (as defined below), or to the sale of those Units after completion. To the contrary, the Trustee supports both of those business concepts and has been working to accomplish that construction and sale for months. Prior to the Debtor's bankruptcy filing, two problems prevented the construction of the Units. The first problem was the doubling of compensation to an entity that Sean Dunne uses a piggy bank. The second problem was the lack of clarity surrounding the cost to complete construction of the Units and the lack of that funding.

The proposed cash collateral order has solved neither of these problems. The proposed cash collateral budget apparently[1] provides a total of $600,000 in claims for Sean Dunne's Mountbrook USA – more than twice the maximum it can claim under its "contract" with the Debtor. Moreover, the proposed cash collateral order <u>requires</u> a loan from an unnamed insider of the Debtor and Sean Dunne. This is a loan that the Debtor (one entity controlled by Sean Dunne) "negotiated" with its owner (another entity controlled by Sean Dunne) to grant security to its

---

[1] The Trustee has inquired with the Debtor about the compensation to be paid to Mountbrook USA, but has not yet received a response.

owner (Sean Dunne), to grant an administrative priority to its owner (Sean Dunne), and to pay money to its owner (Sean Dunne).  The cash collateral order *requires* this Court to place the equity of the Debtor (Sean Dunne) ahead of all of its non-insider creditors – with the exception of Avant.

To the extent that relief can be fashioned to provide financing to the Debtor, to allow for the construction of the Units, and to allow for the sale of those Units, without diverting the value of such financing, construction and sale to Mr. Dunne (and the current proposal has a shocking amount of value being provided to Mr. Dunne), the Trustee would support such relief.  Notably, that relief is easily fashioned – the Trustee would support the approval of interim use of cash collateral so long as each and every payment made pursuant to such cash collateral authority (i) was made directly by a party unaffiliated with the Debtor, (ii) was specifically set forth in a budget approved after full disclosure (which is most definitely not the budget attached by the Debtor to its Cash Collateral Motion), (iii) is not paid to Sean Dunne or any person or entity affiliated with (or otherwise associated with) Sean Dunne, and (iv) is objectively necessary to prevent immediate and irreparable harm to the Debtor as required by the law.   The Trustee does object, however, to the proposal put forth by the Debtor.  It is largely self-interested and seeks court approval to allow Sean Dunne to usurp the value and benefit of such construction and sale for himself, not for the creditors of this estate or the estate of Sean Dunne personally.  It seeks approval of the payment of substantial pre-petition claims without disclosure to (much approval by) the Court, it seeks unfettered authority for the lender – an interested party with financial incentives that are directly contrary to the interests of every other party in this case – to approve additional payments without court oversight, it seeks the immediate payment of unexplained

costs and expenses that cannot be reasonably considered "necessary to preserve value," and its

seeks all of this on an 'emergency' basis with no disclosure or discovery related thereto.

More immediately, for these reasons, and as set forth more fully below, (i) interim relief

relating to the Cash Collateral Motion should be limited to only those costs and expenses that are

fully disclosed to the Court and are necessary to prevent irreparable injury to the estate (which

are likely limited to payments for power, insurance and security), and (ii) final consideration of

the Cash Collateral Motion should be conducted simultaneously with consideration of the DIP

Financing Motion (as defined below), and should be conducted after the conclusion of full and

appropriate discovery into and disclosure related to the purported justification for the relief that

is requested by the Debtor, and into the facts and circumstances behind this Motion.

## STANDING

The trustee has standing to be heard on this Motion pursuant to section 1109 of the

bankruptcy Code.  Specifically, Section 1109 of the Bankruptcy Code provides that a "party in

interest, including … the trustee … [or] a creditor may raise and may appear and be heard on any

issue in a case under this chapter."  Moreover, Rule 4001 of the Federal Rules of Bankruptcy

Procedure, which require notice and a hearing on a motion for use of cash collateral, does not

limit the parties entitled to be heard at such hearing.  *See also In re Bumper Sales, Inc.*, 907 F.2d

1430 (4th Cir. 1990) (recognizing objection of creditors committee to the cash collateral

agreement and associated relief); *In re FRG, Inc.*, 107 B.R. 461 (Bankr. S.D. N.Y. 1989)

(explaining that § 1109(b) is not an exhaustive list of who is a party in interest; it is merely

illustrative).  Section 1109(b) "is to be construed broadly, in order to allow parties affected by a

chapter 11 case to appear and be heard."  *In re Public Service Co. of New Hampshire*, 88 B.R.

546, 550 (Bankr.D.N.H.1988).

4

Considering that all parties in this case have a substantial interest in the motions before the Court, and considering that the Trustee owns the beneficial interest in the real estate that the cash collateral motion seeks to encumber, there is no basis or justification for unilaterally creating such a limitation in this case.

However, if the Court chooses to limit standing on the issue of cash collateral use, the Trustee nonetheless has standing to object to the substantial additional relief requested in the Cash Collateral Motion. The trustee has standing to object to any request for adequate protection, to the request (as back-handed as it may be) to pay pre-petition claims, to the request to encumber the Debtor's property with liens and super-priority claims, to the request to enter into highly material and damaging transactions with an insider (Sean Dunne), and to the request to approve post-petition financing, among other things.

## FACTUAL BACKGROUND

As this Court is aware, the Sean Dunne history – which very much includes this Debtor – is long and tortured. Mr. Dunne owes as much as €500 million to various European banks, and yet he claims to have essentially no assets at all. He has admitted under oath that – among other things – he previously transferred over €100 million to his purported wife, Gayle Killilea Dunne, in return for "cooking the odd meal and cleaning the odd shirt."

It is those funds, among others, and the proceeds and subsequent transfers thereof, that purchased the property at the heart of this case (the "**Property**"). And it is those funds, among others, that the Trustee is currently seeking to recover pursuant to the adversary proceeding (the "**Adversary Proceeding**") initiated in the personal bankruptcy case of Sean Dunne (the "**Dunne Bankruptcy Case**"). Because those funds were re-distributed to, among others, the Debtor, the

Property is a meaningful portion of the property that the Trustee is seeking to recover for the benefit of Sean Dunne's creditors.

### The Debtor and the Property

This Court will soon see that the Debtor is a sham entity which is owned by a "trust" for the benefit of Sean Dunne's minor children whose trustee is Dunne's adult child, and is "managed" by Sean Dunne's wife.   The testimony already obtained in the Dunne Bankruptcy Case reveals that all significant decisions about the Debtor and the Property are made by Sean Dunne.  More specifically, Avant Capital 151 Milbank, LLC (the "**Avant**") – the lender in the Cash Collateral Motion – testified that it dealt with Sean Dunne (and occasionally James Ryan, a Dunne confidante from Dublin) with respect to, among other things, (i) the construction budget, (ii) the management of the project, and (iii) the construction of the individual units on the Property (the "**Units**").

Based on the best numbers available to the Trustee, Avant is fully secured with a multi-million dollar equity cushion.

### Avant

As this Court is aware, Avant is the pre-petition lender for the Debtor, and has been involved with Sean Dunne for several months.  In the Dunne Bankruptcy Case, because of the *lis pendens* that the Trustee filed on the Property, Avant filed a motion for relief from the automatic stay or, in the alternative, for adequate protection of its purported security interest in the Property (the "**Adequate Protection Motion**").  In a unique twist, however, the adequate protection that Avant sought was not payment of fees or interests, but rather the ability to put *more* money into the property, subject of course to its priority security interest.  Notably, as part of this Adequate Protection Motion, Avant negotiated several construction budgets with the Debtor (presumably

Sean Dunne), and each of those negotiated budgets included substantial payments to Sean Dunne

personally through his sham entity Mountbrook USA, LLC.

### The Proposed General Contractor

The general contractor that had been purportedly overseeing the construction of the

Units, and that has been proposed to finish the construction, is Sean Dunne's Mountbrook

U.S.A., LLC ("**Mountbrook**").  Mountbrook is another façade for Sean Dunne, and is another

defendant in the Adversary Proceeding.  Although it is nominally owned by Gayle Killilea

Dunne, it is simply an alter ego for Sean Dunne.  Notably, based on the limited discovery that

has been conducted in the Dunne Bankruptcy Case, the Trustee already possesses evidence that

Mountbrook is a piggy bank for Sean Dunne and his family.  Although discovery continues with

respect to Mountbrook and the other defendants, the Trustee has uncovered evidence that

Mountbrook does little (perhaps nothing) more than support the Dunnes' lavish lifestyles.

Mountbrook has paid for spa retreats, expensive meals and wine, limo rides, and hotel stays,

among other things, for the Dunnes, and has transferred more than $350,000 in cash (much of

which was provided by Avant) to Sean Dunne and his adult son, John Dunne.

It is this "general contractor" that the Debtor seeks authority to pay on a post-petition

basis, without court or third-party oversight (and for which it seeks to *double* its contractual fee).

### The Proposed Budget

The budget attached as an exhibit to the Cash Collateral Motion (the "**Current Proposed
Budget**") is <u>at least</u> the <u>*fourth budget*</u> for the completion of the Property, each of which has

turned out to be entirely unreliable.  At first, Avant and the Debtor 'negotiated' a budget for the

completion of the project prior to Avant's funding of the Loan.  This budget (the "**First
Budget**"), presumably reflected in the "Approved Budget" column of the Current Proposed

Budget, contemplated a total construction budget of approx. $7.67 million (including the $3.3

million acquisition cost).  After the loan was funded and the Trustee filed his *lis pendens* on 151

Milbank, Avant and the Debtor negotiated another budget (the "**Second Budget**"), presumably

reflected in the "Agreed Revised Budget" column in the Current Proposed Budget,that

contemplated a total construction budget of approx. $9.5 million.  Simultaneously with Second

Budget, Avant provided its estimate for the cost to complete the project (the "**Third Budget**"),

The Second Budget anticipated a completion budget of $9,511,941, and the Third Budget

anticipates the exact same number (to the dollar), but with entirely different line items to get

there.

Note that these changes are not simply recognition of new developments – they are

complete restatements.  For instance, the First Budget projected that the "foundations, drainage

and rock" would cost $442,367, the Second Budget projected that it would cost $598,971, the

Third Budget projected that it would cost $383,023, and the Current Proposed Budget provides

for only $50,000.

These wild fluctuations are consistent throughout the entirety of the Current Proposed

Budget.  "Siding and Trim" increased by a third.  "Electrical" increased by 50%.  "Landscape

and paving" actually increased by more than 250%!  Each of these items reflect costs that are

routinely estimated accurately by a builder with experience, and yet these costs – under the

leadership of Sean Dunne and Mountbrook – are mysteriously now costing more than $1.5

million more than estimated, and all without *any* explanation or justification. In fact, *every single

line item* identified for 'emergency' payment has been increased over its originally budgeted

amount, and each without explanation or justification.

This is the exact concern that the Trustee expressed multiple times to Avant and the Debtor in connection with the Adequate Protection Motion in the Dunne Bankruptcy Case, and is the exact reason that a consensual deal on that Adequate Protection Motion was never reached. The Trustee has asked, repeatedly, for explanation or justification for the increase in expenses (ignoring for the moment the obvious self-dealing set forth above that provides Sean Dunne – through his sham entity Mountbrook USA – with hundreds of thousands of dollars without any justification), and neither the Debtor nor Avant have ever offered any explanation at all (other than a one-page chart with, essentially, no meaningful information on it).  The Trustee attempted to mediate these issues with Avant and the Debtor, but they refused to do so.

It is worth noting that it appears the Trustee was correct to reject the Third Budget pre-petition because it sought more than $2.2 million to complete the project that the Debtor now claims will only take $1.1 million to complete.

This definitive lack of clarity and reliability is absolutely crucial to the Debtor's estate (and the lack of clarity and reliability is absolutely critical to Sean Dunne).  The equity value in this Property will most likely *go down* if the relief requested in the Cash Collateral Motion (and DIP Financing Motion) is granted but the construction of the Units is not completed. Specifically, if the Debtor uses its cash collateral and/or borrows money from an insider (as set forth below), and then fails to complete the project (as it has done multiple times), the proposed continued investment in the Property would increase the debt on the property (some of which would be repayable to Sean Dunne), without increasing the value of the Property.  With that in mind, the Current Purported Budget has to be viewed with extreme caution – this Court simply cannot trust that the contemplated construction will be completed as proposed, especially considering the entire proposal has been orchestrated by Sean Dunne.

**The Motion, and Request for Interim Relief**

Although it is not entirely clear from the papers (as set forth in the more detail below), the Cash Collateral Motion appears to seek authority from the Court to make more than $1 million in payments from "cash collateral" in the Debtor's bankruptcy case.   Moreover, while it is again not entirely clear from the papers, it appears that the Debtor seeks authority to fund more than $500,000 of that amount on an interim basis, because of a purported "emergency."   The sum total of the "emergency" cited by the Debtor is a single sentence:  "Approval of the interim order is essential in that impending cold and deteriorating weather conditions may cause unexpected delays in completing the Development."  Para. 16.

Moreover, the Cash Collateral Motion seeks authority for interim use of "cash collateral" in accordance with Exhibit B (Para 16), but there is no exhibit B to the Motion.  Instead, Exhibit A to the Cash Collateral Motion includes a single column at the end of a larger spreadsheet (so far largely unexplained) entitled "interim order."  That column appears to contemplate payment of over $545,000 in costs and expenses (the "**Interim Amount**") on an "emergency" basis,[2] without any explanation or justification.  Needless to say, that simply cannot be accurate.

Even a cursory review of the proposed Interim Amount shows that none of the proposed costs are "emergency" costs.  The Debtor apparently seeks authority – immediately, without proper notice or an opportunity for any party to evaluate the efficacy of the request – to spend more than $100,000 on "landscaping and paving," more than $44,000 on the "toilet/bath and showers," and more than $17,000 on the "exterior paint."  Indeed, of the 24 line items that the Debtor seeks to fund on an 'emergency' basis, only ONE could reasonably considered time

---

[2] The Trustee has attempted to determine the amount of "interim" cash collateral that the Debtor seeks authority to use, but his efforts have thus far been unsuccessful.

sensitive – the payment of insurance.  Every single other expense is, at best, an ordinary course

construction expense that can just as easily be incurred in three weeks following a final hearing.

Even more problematic, the proposed budget is facially rife with examples of self-dealing

and illicit payments to Sean Dunne (or his family or companies).  Mountbrook (which, as set

forth above, is a personal piggy-bank for Sean Dunne and his family) contractually agreed to

oversee the construction of the Units for a one-time fee of $300,000.  The Current Proposed

Budget contemplates $600,000 in payments to Mountbrook (the Debtor generously conceded

that only $96,000 of that additional amount would be paid from the cash collateral).  Moreover,

one entire column in the budget is entitled "owed to MUSA/GKD" (presumably meaning it is

owed to Mountbrook and Gayle Killilea Dunne) and totals over $4.1 million.

Most notably, it appears that many of the expenses that the budget proposes to pay are

pre-petition claims which – obviously – the Debtor has no authority to pay.  The Debtor casually

slips into the Cash Collateral Motion that its DIP Financing Motion seeks to "pay certain pre-

petition debt" (Para. 12), but neither the DIP Financing Motion nor the Cash Collateral Motion

identify or explain which pre-petition debt it seeks to pay, why it would seek to do so, or on what

possible basis it does or could have authority to make such payments.  Moreover, it doesn't even

bother to propose a justification for granting the Debtor carte-blanche authority to pay any pre-

petition creditor it seeks to pay, without court oversight or approval, or how such extraordinary

relief is appropriate for a cash collateral motion (much less as a casual 'aside' in a Cash

Collateral Motion).

Perhaps most troubling, the Cash Collateral Motion proposes that the Debtor should have

authority – on an emergency basis, of course, with no oversight or authorization – to make *any*

*payment* it wants to, so long as the Lender (an entity with a direct financial incentive to make as

many loans as possible) agrees.  See, for example, Para 14 of the Cash Collateral Motion, which

casually mentions that "[t]he Debtor further requests that it be able to vary from each line item

on the Budget with the written consent of the Lender."  In other words, the Debtor and the

Lender have essentially agreed that the Debtor can spend any amount it wants on any line item

(including the "general contractor fee" to Sean Dunne), so long as the Lender gets repaid.  Of

course, this Court cannot – and undoubtedly will not – abdicate its supervisory role over the

Debtor in favor of Avant.

<u>The Proposed Order</u>

The proposed order attached to the Cash Collateral Motion is shockingly inappropriate.

Among other things, the entirety of the adequate protection requested in the Cash Collateral

Motion consists of one paragraph – paragraph 17 – in which the Debtor proposes a replacement

lien and super-priority administrative claim for the Lender.  The Order, however, is 26 pages

long, and includes substantial relief and brand new terms and conditions that are not disclosed in

the Motion, much less identified and explained.  Among other things, the proposed order:

- Makes factual findings not related to any allegation in the Motion, much less to a fact that has been established in this case, including the nature of the "Loan Documents," which have not been attached to the Motion.  The proposed Order also includes factual findings about a "business" and "operating expenses" that simply do not exist in this case;

- Includes waivers and releases that are not disclosed, or even mentioned, in the Motion;

- Identifies and approves (as part of the interim relief) brand new terms and conditions that are not identified in the Motion, much less explained and disclosed, including material terms related to termination dates and maturity dates;

- Authorizes the Debtor to use Cash Collateral as set forth in Exhibit A, which, although not actually attached to the proposed order, is presumably the overall budget for the entirety of the construction (not just 'emergency' costs necessary to

preserve the property pending a final hearing).  This provision also includes
blanket authority for the Debtor to pay _any_ claim that the Lender approves;

- Authorizes explicit adequate protection that goes well beyond allowing the Debtor
  to protect asset values while the Motion is pending final review, and that
  noticeably (and likely intentionally) tilts the scales in favor of Sean Dunne.
  Among other things, it includes:

    o a provision ostensibly _requiring_ the Debtor to enter into new contracts
      with the General Contractor (i.e., Sean Dunne) (see Para. 9.b.),
    o a provision _requiring_ the Debtor to pay Mountbrook (i.e., Sean Dunne) a
      new "construction management fee" equal to more than $96,000, and
      seemingly approving the additional $300,000 "construction management
      fee") (see Para. 9.b. ("the budget will provide that Debtor's affiliate,
      [Mountbrook], will receive a construction management fee in the amount
      of $96,553 to be paid from the Reserves pro rata over the remaining term
      of the Loan, with the balance of the construction management fee to be
      paid after the Loan has been repaid in full")), and
    o a provision _directing_ the Debtor to enter into a post-petition financing
      agreement in the amount of $500,000 (which would seem to be a back-
      door effort to get this Court to pre-grant the pending motion for post-
      petition financing) (see Para 9.g.);[3]

- Authorizes the Debtor to "pay any unpaid post-petition administrative expenses,"
  to meet payroll obligations, and to "satisfy any payment obligation senior to the
  obligations owed to the Lender."  Para 13.b.  Curiously, the Debtor has no
  employees, and asserts that there are no claims senior to the claims of the Lender;

- Includes a provision **_requiring_** the Debtor to sell the Property within 60 days of
  any default; and

- Provides that the entirety of the Interim Order (i.e., including all of the provisions
  set forth above, and all of the provisions regarding use of cash collateral) will
  survive – among other things – a conversion or dismissal of the case.

Almost NONE of these provisions were identified in the Motion, much less explained

and justified.  Moreover, even if the Debtor were to re-file the Motion and actually mention the

relief it was seeking, that relief would not be appropriate for an interim order (in truth, the

---

[3] For the avoidance of doubt, the Trustee does not object to a termination event based on the failure to obtain post-petition financing.  This, however, is entirely different.  As proposed, the Lender is granted adequate protection by way of an order mandating that the "Debtor shall secure a post-petition loan in the of $500,000 …"

proposed interim order is a final order authorizing DIP financing, not an interim order approving

emergency use of cash collateral).

**OBJECTIONS**

**I.     There May be no Cash Collateral in the Estate**

As a starting point, the Trustee does not concede that the funds subject to the Cash

Collateral Motion are, in fact, "cash collateral."  Although Paragraph 7 of the Cash Collateral

Motion asserts that the full $3.5 million loan was funded on the closing date of the loan (Cash

Collateral Motion, Para 7), the remainder of the Cash Collateral Motion suggests otherwise.

Among other things, Paragraph 9 of the Cash Collateral Motion asserts that Avant

"ceased disbursing funds under the Loan" following the filing of the *lis pendens* by the Trustee,

and the "detailed budget" attached to the Motion as Exhibit A refers to "Draw 1,' "Draw 2,"

"outstanding draw," and a bloated and abandoned "supplemental loan."  Moreover, the proposed

order attached to the Cash Collateral Motion refers to "funds to be disbursed or to be advanced

under the Loan Documents" (Proposed Order, Finding E(ii)).  None of those allegations are

consistent with the claim that the Loan was fully funded at closing, but rather suggest –

consistent with the position that Avant has taken before this Court in connection with the

Adequate Protection Motion – instead that the full amount of the loan has not yet been drawn,

but was expected to be drawn in the future.

To the extent the cash "held by the Lender in the Reserve Account" does not constitute

"cash collateral" of the estate, but rather constitutes additional draws under a pre-petition loan

that were never funded, the entirety of the "Cash Collateral Motion" must be denied.  The

Trustee reserves its rights to examine and, if necessary, challenge any evidence the Debtor seeks

to introduce in connection therewith.

14

## II.    **The Debtor's Request for Interim Relief is Not Appropriate.**

Even if the "Reserves currently held by the Lender" constitute cash collateral, the Trustee objects to the approval of any relief on an emergency basis.  This case is too rife with self-dealing and internal conflicts to allow any relief, especially relief as critical as funding on a senior secured basis, without full disclosure and discovery related thereto.

The requested relief is simply not supported by the Bankruptcy Code.  Bankruptcy Rule 4001 provides that "[t]he court may commence a final hearing on a motion for authorization to use cash collateral no earlier than 14 days after service of the motion."  Fed. R. Bankr. P. 4001(b)(2).  Rule 4001 further provides, however, that "[i]f the motion so requests, the court may conduct a preliminary hearing before such 14-day period expires, but the court may authorize the use of only that amount of cash collateral as is necessary to avoid immediate and irreparable harm to the estate pending a final hearing." *Id*.  There is no basis for such emergency relief in this case.

As a starting point, this property has been idle for more than four months, with the knowledge, participation, and acquiescence of both the Debtor and the Lender.  If, as the Motion suggests, the Avant loan was fully funded as of its closing, and the funds have been simply sitting idly, then the failure to do anything to the Property over the past four and half months has been an intentional failure by both Avant and the Debtor.  They cannot sit idly on their hands for four and a half months and then argue that approaching weather conditions (not exactly a surprise in Connecticut in October) justifies the unsupervised and blanket use of funds without appropriate review by interested parties.

Avant and the Debtor may claim that the Trustee is responsible for this delay, but that is simply not true.  The Debtor and Avant took over one month to produce a "budget" for the

Trustee's review (which they have now abandoned) and then took another month to reject the Trustee's requests for mediation by the filing of this Chapter 11 case.

Moreover, at a hearing before the Court more than a week ago in the Dunne Bankruptcy Case, the Debtor's purported counsel notified the Court of the pending filing by the Debtor. (The Debtor's counsel first mentioned the potential of a bankruptcy filing by 151 Milbank in *July*.)  If the upcoming weather patterns were, in fact, a surprise to the Debtor and Avant that required immediate Court intervention, it was incumbent on the Debtor to file immediately, not to wait more than a week and then seek "emergency relief" to the detriment of all other constituencies. It is inappropriate to reward the Debtor for such intentional delay by granting emergency relief and denying appropriate consideration of the facts and circumstances related to this Motion.

Under the circumstances of this case, and considering only the facially obvious examples of self-dealing and conflicts set forth herein, the parties are entitled to the proper evaluation of the facts and circumstances surrounding any proposed relief prior to an order of this Court to their detriment.

To the extent that some emergency relief is necessary, the Trustee would consent to such relief so long as:  (1) Any order granting such relief states explicitly that no payment can be made to or for the benefit, directly or indirectly, of Sean Dunne, Gayle Killilea Dunne, John Dunne, Mountbrook, or any other entity or person affiliated or associated with any of the above, (2) Each and every payment must be approved by the Court after full disclosure and must be established to be necessary to avoid immediate and irreparable harm to the estate (the Trustee assumes any such cost would be limited to expenses for insurance, electricity/heat, and security), and (3) Each payment must be made directly to the third-party vendor by a non-insider third party.

When considering emergency relief, the Trustee urges this Court to consider the potentially catastrophic effects of granting the requested relief without full and fair consideration thereof.  As discussed above, the lack of credibility surrounding the Current Proposed Budget is absolutely critical – if the Debtor spends another $1 million on the construction, AND borrows another $500,000 on top of that (presumably from yet another Sean Dunne entity), and yet does not complete the project, the equity value in the Property will have been destroyed to the detriment of every party in this case (other than Sean Dunne).  The Trustee has sought information with which to test the Third Budget (and by extension the Current Proposed Budget) for weeks, but has received only a single piece of paper in response.  The piece of paper attempted to justify hundreds of thousands of dollars in payments to Sean Dunne based, in significant part, on his travel, lodging, and automobile expenses.

Otherwise, the Trustee objects to any interim relief on the basis that it is not necessary to "avoid immediate and irreparable harm to the estate pending a final hearing." The Debtor has not alleged, and cannot prove, that it will suffer immediate and irreparable harm unless it obtains emergency authority to obtain an "interim" cash collateral order.

### III.    This Debtor is Not Entitled to the Deference With Respect to its Business Judgment

It is absolutely critical to remember that this Debtor is simply another placeholder for Sean Dunne, and that this Motion is a request to borrow money so that one Sean Dunne entity can pay money to another Sean Dunne entity.  The inability to negotiate a consensual deal with respect to the Adequate Protection Motion in the Dunne Bankruptcy Case was due entirely – entirely – to the Debtor's insistence (and Avant's agreement) that substantial payments had to be made to Mountbrook, without any rational explanation or justification therefore.

17

Moreover, Avant is not (nor can one expect it to be) an objective arbiter of payments with respect to the relief requested in the Motion.  Avant has been involved with Sean Dunne for months and has proven itself entirely incapable of curbing Mr. Dunne's desire to divert value away from his creditors and to his family.  Every single budget that has been "approved" by Avant includes substantial payments to Sean Dunne, most notably including a "general contractor fee" that is *double* what he contractually agreed to.[4]  Moreover, it is apparent that even Avant mistrusts Dunne/Mountbrook/151 Milbank, because it seeks to control the flow of "cash collateral," by Avant making payment to contractors directly (notably, even this "control" seems cursory – it is hardly stated with clarity or finality in either the Cash Collateral Motion or the massive proposed order) .  However, Avant is not – and can and should not be – a fiduciary responsible for the best interests of the bankruptcy estate.

It is also important to recognize that this entire bankruptcy case appears to be an intentional strategic gambit by Mr. Dunne to divert value out of the Property and to Mr. Dunne and his family.[5]  The Court should not be fooled by the Debtor into thinking that the Motion – and the bankruptcy case in general – is simply an effort to develop and sell the Units.  The

---

[4] This is not necessarily an attack on the good faith or independence of Avant.  Avant is a third party lender with obligations to its own constituencies.  It is not unreasonable, and is in fact expected, for Avant to act in its own best interest with respect to this credit.  The problem, of course, is that Avant's best interest is NOT the same as the estate's best interest, or the best interest of the other constituencies in this case.  In fact, because Avant makes money based on how much the Debtor borrows (the more money borrowed, the more that Avant makes), Avant's interest is actually directly contrary to all other parties.  This concern is not academic – even a cursory examination of the budgets that Avant has "approved" shows that Avant's only concern is repayment, not the efficacy of any specific line item.

[5] It is also worth noting that, according to the Debtor's schedules, it does not have a single legitimate creditor other than Avant, every single creditor listed on its books is disputed and actually a creditor of Mountbrook.  Considering that Avant has apparently consented to all of the relief the Debtor has requested, and could have also consented to the exact same relief outside of bankruptcy, the need for this case – other than to achieve some questionable result – is hard to identify.

Trustee long ago made clear that he fully supported that effort as long as extra payments were not made to Mr. Dunne or his family.  Instead, the Debtor filed for bankruptcy protection and asked this Court to sign off on those exact payments.

Finally, in considering the good-faith nature of this case, it is worth considering the odd (to say the least) motion filed by the Debtor for approval of debtor-in-possession financing (the "**DIP Financing Motion**").  Although the Motion does not identify the proposed lender for such financing, it sets forth the specific terms of such financing, establishing that it therefore knows the identity of the lender.  On information and belief, the mystery financer for the Debtor (who is seeking senior secured status, substantial interest payments, extension fees, exit fees, etc., and is seeking them all behind the cloak of secrecy) will be Sean Dunne, or a newly formed entity that Sean Dunne controls.

The fact that he is seeking to fund this Debtor is obviously problematic – it is essentially an effort to launder funds that otherwise belong to the Sean Dunne bankruptcy estate, by lending them to the Debtor (no doubt through a new offshore entity for which they will refuse any disclosure) and then getting repaid by order of this Court.

The fact that the Debtor is so blatantly complicit in this new effort is quite meaningful when considering the conduct of this case, and whether to put _any_ reliance in the business judgment of the Debtor.

As a result of all of these circumstances, most notably including the extraordinary and pernicious conflicts and self-dealing that is already evident in this case, the Court should not blindly defer to Sean Dunne's "business judgment," but should insist that all transactions in this case be conducted in the light of day, and only after a full and fair evaluation of the merits of those transactions by the Court.

19

IV.     **This Court Should Consider the Critical Matters in This Case Together, and Only After Full and Final Disclosure and Discovery is Completed**

For all of the reasons set forth above, among others, the Trustee intends to file a motion for the appointment of a chapter 11 trustee in this case.  Such an appointment would be in everyone's best interest.  It would allow the consideration of potential post-petition financing proposals without conflicts or self-dealing.  It would allow the negotiation of a more objectively reasonable cash collateral order with Avant.  And it would allow the immediate construction and sale of the Units without the potential for abuse by a self-interested Debtor and general contractor, all without the extraordinary expense and delay associated with the inevitable litigation in this case if no independent third party is appointed.

Notably, other than the Debtor's desire to maintain the ability to divert value to Sean Dunne and his family, there is no argument against such an appointment.

Finally, because the allegations, disclosure, discovery, and misconduct are so intertwined with respect to Sean Dunne, John Dunne, Gayle Killilea Dunne, Mountbrook and the Debtor, the Trustee asserts that this Court should consider the relief requested in the Cash Collateral Motion simultaneously with the motion for the appointment of a chapter 11 trustee (which will be filed shortly), and the DIP Financing Motion.

**RESERVATION OF RIGHTS**

The Trustee expressly reserves any and all rights, claims, defenses and remedies, including, without limitation, to supplement this Objection with information learned in any discovery, to raise further and other objections to the Cash Collateral Motion or any other motion, and to introduce evidence at any hearing regarding the Cash Collateral Motion.

## NOTICE

Notice of this Objection has been given to: (a) the Office of the United States Trustee for the District of Connecticut; (b) the Debtor; (c) counsel for the Lender; and (d) all parties who have timely filed requests for notice pursuant to Bankruptcy Rule 2002.  The Trustee submits that no other or further notice is necessary under the circumstances.

## CONCLUSION

For all of the forgoing reasons, and for the arguments set forth, the trustee respectfully requests that the court (a) deny emergency relief requested in the Cash Collateral Motion, (b) deny the final relief requested in the Cash Collateral Motion pending full disclosure and discovery, and (c) grant such other and further relief as is just and proper.

Dated:  October 26, 2015         RICHARD M. COAN, TRUSTEE

By  /s/ Timothy D. Miltenberger
Timothy D. Miltenberger (ct08874)
Coan, Lewendon, Gulliver & Miltenberger, LLC
495 Orange Street
New Haven, CT  06511
(203) 624-4756
(203) 865-3673 FAX
tmiltenberger@coanlewendon.com

**<u>CERTIFICATION</u>**

I hereby certify that on October 26, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

/s/Timothy D. Miltenberger
Timothy D. Miltenberger